*TERRY A. DAKE, LTD.*
**P.O. Box 9134**
**Phoenix, Arizona  85068-9134**
**Telephone: (602) 710-1005**
**tdake@cox.net**

**Terry A. Dake - 009656**

Attorney for Trustee

### IN THE UNITED STATES BANKRUPTCY COURT

### FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| In re: | ) | In Chapter 7 Proceedings |
| | ) | |
| SEDONA VINEYARDS, LLC; | ) | Case No. 2:24-BK-09126-BMW |
| | ) | |
| Debtor. | ) | |

### NOTICE OF FILING LETTER OF INTENT

Please take notice that the trustee has received and approved the attached letter of intent for the sale of the real property owned by the estate.

DATED April 7, 2026.

*TERRY A. DAKE, LTD.*

By /s/ TD009656
  Terry A. Dake
  P.O. Box 9134
  Phoenix, Arizona 85068-9134



**Warren J. Stapleton**

wstapleton@omlaw.com          Direct Line   602.640.9354

2929 North Central Avenue          Telephone   602.640.9000
21st Floor                                       Facsimile    602.640.9050
Phoenix, Arizona  85012               omlaw.com

April 7, 2026

***Via E-mail and U.S. Mail***

Terry A. Dake
TERRY A. DAKE, LTD.
P.O. Box 9134
Phoenix, AZ 85068-9134
Telephone: 602-710-1005
e-mail: tdake@cox.net

   Re: Letter of Intent for Sedona Vineyards Purchase

Dear Terry:

   Our firm represents Arizona Water Company.  Per our discussions this letter sets forth  the terms of a letter of intent for the potential purchase of the real property owned by the Sedona Vineyards Estate (*In re Sedona Vineyards, LLC*, Case No. 2:24-BK-09126-BMW).

   This letter of intent, effective as of April 6, 2026 ("**Effective Date**"), constitutes an expression of the interest of Arizona Water Company ("**Purchaser**") in purchasing and the interest of the bankruptcy estate of Sedona Vineyards, LLC  (the "**Seller**")  through the duly appointed Chapter 7 Trustee, Brian J. Mullen, solely in his capacity as the Sedona Vineyards Trustee (the "Trustee) in selling the Property (as hereinafter defined) on the general terms and conditions described herein. It will also serve as the basis for negotiating a definitive purchase and sale agreement for the purchase and sale of the Property (the "**Purchase Agreement**"). This letter of intent supersedes all prior oral and written proposals between the parties. The proposed terms and conditions for the purchase and sale of the Property are as follows:

   1. The Property. That certain property having an address at 4250 N. Montezuma Avenue, Lake Montezuma, Arizona 86335 and commonly known as the Beaver Creek Golf Resort property (the "**Property**").  A copy of the legal description for the Property is attached hereto as Exhibit A.

   2. Execution of Purchase Agreement.  Purchaser and Seller shall negotiate the Purchase Agreement diligently and in good faith. Notwithstanding the foregoing, no binding agreement shall exist with respect to the purchase and sale of the Property unless the Purchase Agreement has been duly executed and delivered by both Purchaser and Seller. Purchaser and Seller shall endeavor to enter into and execute the Purchase

Agreement within ninety (90) days from the Effective Date. Purchaser's counsel shall prepare the initial draft of the Purchase Agreement.

3. <u>Purchase Price</u>. Three Million and 00/100 ($3,000,000) Dollars, all cash, in immediately available funds. The purchase price shall be paid by the Purchaser at the closing of the sale of the Property, except for the Earnest Money Deposit, which shall be paid as and when set forth in Paragraph 4 below.

4. <u>Earnest Money Deposit</u>. Three Hundred Thousand and 00/100 ($300,0000) Dollars (the "**Earnest Money Deposit**") to be deposited by Purchaser in immediately available funds within five business days after full execution of the Purchase Agreement by Purchaser and Seller, in a mutually acceptable interest-bearing escrow account established with Pioneer Title Agency ("**Escrow Agent**"), as escrow agent.  All interest earned on the Earnest Money Deposit shall constitute part of the Earnest Money Deposit and shall be payable to the party entitled to receive it under the Purchase Agreement. If the closing shall occur, the Earnest Money Deposit shall be credited to the purchase price. If Purchaser terminates the Purchase Agreement pursuant to a right to do so set forth in the Purchase Agreement, the Earnest Money Deposit shall be refundable to Purchaser except in the event of Purchaser's default or breach, in which event the Earnest Money Deposit, plus all interest earned thereon, shall be paid to Seller as liquidated damages, as Seller's sole remedy. The parties agree that the Earnest Money Deposit shall be nonrefundable to Purchaser except in the event of: (a) a default by Seller under the Purchase Agreement; (b) a failure of any of the conditions to closing to Purchaser's obligation to close under the Purchase Agreement; (c) any other customary circumstances to be provided in the Purchase Agreement; and/or if the Bankruptcy Court does not approve the proposed sale.

5. <u>No Financing Contingency</u>. Purchaser is prepared to pay all cash for the acquisition of the Property and its obligation to purchase the Property shall not be conditioned in any way on Purchaser's ability to obtain financing, whether first mortgage or otherwise.

6. <u>Bankruptcy Court Approval.</u>  This transaction shall be subject to an auction sale before the United States Bankruptcy Court for the District of Arizona (the "Bankruptcy Court") in *In re Sedona Vineyards, LLC*, Case No. 2:24-BK-09126-BMW (the "Bankruptcy Case").  No sale shall be final unless approved by the Bankruptcy Court according to the terms of the Purchase Agreement or a Bankruptcy Court-approved written modification of the Purchase Agreement.

7. <u>Closing Date</u>. The closing of the transaction shall occur within 30 days following the expiration of the Inspection Period (hereinafter defined) "**Closing Date**"). Each party shall have the right to adjourn the closing date for a period of five (5) business

days for any reason or no reason, but in no event shall the closing date occur later than five business days following bankruptcy court approval of the transaction. The closing shall be effected through a customary escrow closing.  Time shall be of the essence with respect to each party's obligations under the Purchase Agreement.

8.      Closing Costs. Purchaser shall pay the cost of the survey, title commitment, title policy, and other title-related costs, as well as any and all costs related to its due diligence investigation. Seller and Purchaser shall each pay an equal share of all clerk's and indexing fees and taxes on the deed, and all costs of recording the deed, and any other fees and costs as is customary in transactions of this size and type in Yavapai County, Arizona. Each party shall pay its own legal fees and one-half of any escrow or closing fee.

9.      Credits and Prorations. The Purchase Agreement shall contain customary prorations with respect to rents, other lease payments, real estate taxes, and any and all items customarily prorated between the parties in transactions of this size and type in Yavapai County, Arizona.

10.      Due Diligence Investigation. From and after the effective date of the fully-executed Purchase Agreement, and continuing for a period of ninety days (90) days thereafter (the "**Inspection Period**"), Seller shall allow Purchaser to have access to the Property to investigate and inspect (at Purchaser's sole cost and expense) the legal, physical, economic, and environmental condition of the Property, and the suitability of the Property for Purchaser's intended use. If Purchaser determines, in its sole and absolute discretion, that it is unsatisfied with any aspect of the Property prior to the expiration of the Inspection Period, then Purchaser shall have the right to terminate the Purchase Agreement by written notice to Seller given prior to the expiration of the Inspection Period, in which event the Earnest Money Deposit shall be returned to Purchaser.

No later than thirty days (30) days following the effective date of the fully-executed Purchase Agreement, Trustee/Seller shall provide to Purchaser for its review, all information and documentation regarding the Property which is in the possession or control of Seller, its affiliates, and/or property manager (the "**Due Diligence Materials**"). Seller shall represent in the Purchase Agreement that to the best of the Trustee's knowledge, the Due Diligence Materials constitute all the information and documentation relating to the Property that is in Seller's possession.  As explained in more detail below, the sale is "As Is, Where Is."

Purchaser understands and agrees that any on-site inspections of the Property shall occur at reasonable times agreed on by Trustee and Purchaser after reasonable prior written notice from Purchaser to Trustee (which shall, in all cases, be at least 24 hours in advance) and shall be conducted so as not to unreasonably interfere with

the use and operation of the Property and rights of Seller and its tenants, subtenants, licensees, or other users and occupants of the Property. Purchaser agrees not to contact, or have discussions, whether directly or indirectly, with any tenants, subtenants, licensees, or other users or occupants of the Property without the prior written consent of Seller or Trustee in each instance, which consent shall not be unreasonably withheld, conditioned, or delayed.  Trustee shall have the right to accompany Purchaser or its agents during any such tests and inspections. If Purchaser desires to do any invasive testing at the Property, then Purchaser shall do so only after reasonable prior written notice to the Trustee  (which shall, notwithstanding anything to the contrary contained above, be at least three (3) days in advance) and obtaining Trustee's prior written consent thereto, which consent shall not be unreasonably withheld, conditioned, or delayed  and which consent, if given, may be subject to any terms and conditions imposed by Trustee in his reasonable discretion, including, without limitation, the prompt restoration of the Property to substantially the same condition as existed prior to any such inspections or tests, at Purchaser's sole cost and expense. Prior to conducting any physical inspection or testing at the Property, other than a mere visual examination, by Purchaser or its agents, employees, contractors, or representatives, Purchaser shall deliver insurance certificates to Trustee evidencing that Purchaser carries and maintains such general liability insurance policies with such companies and in such scope and amounts as are acceptable to Trustee in his reasonable discretion, and in all cases, naming Seller as an additional insured party and loss payee thereunder. At Trustee's request, Purchaser shall promptly furnish to Seller copies of any reports received by Purchaser relating to its inspections of the Property.

Purchaser agrees to protect, indemnify, defend, and hold Trustee and the Seller's estate (collectively the "**Indemnified Parties**") harmless from and against any claims for liabilities, losses, expenses (including reasonable attorneys' fees), damages, or injuries actually incurred by any of the Indemnified Parties arising out of, resulting from, relating to, or connected with: (a) any inspections or testing of the Property by Purchaser or its agents, representatives, contractors, or employees; and (b) any breach or violation of the provisions of this Paragraph 10 on the part of Purchaser. The foregoing indemnity shall survive the termination of the Purchase Agreement.

11.    <u>Representations and Warranties</u>.  The Property is being sold with no representations and warranties except that the Trustee is duly appointed and authorized to conduct the sale

12.    <u>Closing Conditions</u>. Purchaser and Seller shall comply with the Closing Conditions set forth in the Purchase Agreement.  The Purchase Agreement will contain other reasonable and customary closing conditions and other contingencies as agreed to by the parties.

13.     Termination. This letter of intent shall automatically terminate and be of no further force and effect upon the earlier of: (a) the mutual execution of the Purchase Agreement by Purchaser and Seller; (b) the date of the written notice given by either Purchaser or Seller terminating this letter of intent to the other; and (c) ninety-one (91) days following the Effective Date. Notwithstanding anything to the contrary contained in the previous sentence, Paragraph 10 shall expressly survive the termination of this letter of intent.

14.     Non-Exclusive Negotiations. Purchaser understands that the Trustee has a fiduciary duty to continue to offer the Property to other interested parties.  Trustee agrees, however, that if the parties execute a Purchase Agreement for the Property before the Trustee executes a Purchase Agreement for the Property with any other party, then Purchaser shall be the stalking horse bidder in the Trustee's Motion to Sell the Property in the Bankruptcy Court.  The Trustee agrees that he shall file such a Motion to Sell the Property no later than fourteen (14) days following the execution of the Purchase Agreement.

15.     Confidentiality. This letter of intent is being transmitted to you with the express understanding that its contents and the fact that it has been transmitted remain confidential. By execution of this letter of intent, and with the exception of those duties of transparency required by the Trustee's fiduciary responsibility to the bankruptcy estate, each party agrees to maintain the confidentiality of the other party's involvement (including the identity of such other party) in a possible transaction as described herein, including, without limitation, the structure and pricing thereof as well as the terms of the transaction, and not disclose same to any person or entity other than: (a) on an as-needed basis, to such party's advisors, agents, consultants, lenders, and potential lenders and the applicable party shall inform them of the confidentiality requirements of this letter of intent and their duty to comply with its terms; (b) with respect to any other disclosures required by law; or (c) disclosures consented to by both parties.

16.     Nonbinding. This letter of intent is a nonbinding proposal and may be terminated without penalty at any time and for whatever reason by either party in accordance with the terms of Paragraph 13 herein. This letter of intent should not be considered as a commitment to sell or purchase by either party, as the purchase and sale is expressly conditioned upon the execution and delivery of a mutually satisfactory Purchase Agreement.

By signing this letter of intent, the parties agree that unless and until a definitive Purchase Agreement is prepared and executed by all parties involved, there is no commitment on Seller's part to convey the Property nor on Purchaser's part to pay any consideration for the conveyance of the Property. Notwithstanding the foregoing, the

parties acknowledge and agree that the provisions of Paragraph 14 and Paragraph 15, together with this paragraph, are binding and enforceable against the parties. Except as specifically set forth in this Paragraph 16, nothing contained in this letter of intent shall be deemed or construed to constitute a binding agreement between the parties.

   If the foregoing terms and conditions are acceptable to you, please execute and return the executed letter to us. This letter may be signed in one or more counterparts, each of which may be an original or copy and all of which when taken together shall constitute one and the same instrument.

Sincerely,

Warren J. Stapleton
Counsel for Arizona Water Company

ARIZONA WATER COMPANY
By
Robert Spear
Vice President and General Counsel
Date: April 6, 2026

AGREED TO AND ACCEPTED this ___ day of April, 2026:

Brian J. Mullen in his capacity as Chapter 7 Trustee for the Bankruptcy Estate of Sedona Vineyards, LLC,

_____
Brian J. Mullen

WJS:pln

parties acknowledge and agree that the provisions of Paragraph 14 and Paragraph 15, together with this paragraph, are binding and enforceable against the parties. Except as specifically set forth in this Paragraph 16, nothing contained in this letter of intent shall be deemed or construed to constitute a binding agreement between the parties.

If the foregoing terms and conditions are acceptable to you, please execute and return the executed letter to us. This letter may be signed in one or more counterparts, each of which may be an original or copy and all of which when taken together shall constitute one and the same instrument.

Sincerely,

Warren J. Stapleton
Counsel for Arizona Water Company

ARIZONA WATER COMPANY

By_____
Robert Spear
Vice President and General Counsel
Date: April 6, 2026

AGREED TO AND ACCEPTED this 6th day of April, 2026:

Brian J. Mullen in his capacity as Chapter 7 Trustee for the Bankruptcy Estate of Sedona Vineyards, LLC,

Brian J. Mullen, Trustee
Brian J. Mullen

WJS:pln

Letter of Intent for Sedona Vineyards
April 2, 2026
Page 7


Enclosure/Attachment
Cc:    Robert Spear

Exhibit A

PARCEL 1:

Lot 6 and Tract A, LAKESIDE TERRACE, according to the plat recorded in Book 12 of Maps, page 24, records of Yavapai County, Arizona.

EXCEPTING all gas, oil, minerals and other like minerals and all other minerals as reserved from said land.

PARCEL 2:

Tract R, THE VILLAS AT BEAVER CREEK, according to the plat of record in Book 58 of Maps and Plats, page(s) 86 through 91, inclusive, records of Yavapai County, Arizona.

Said Tract was formerly known as Lot 39, MONTEZUMA PARK, UNIT SIX, according to the plat of record in Book 9 of Maps and Plats, page(s) 6, 7 & 8, records of Yavapai County, Arizona.

PARCEL 3:

Parcels B and G, THE VILLAS AT BEAVER CREEK, according to the plat of record in Book 58 of Maps and Plats, page(s) 86 through 91, inclusive, records of Yavapai County, Arizona.

PARCEL 4:

The following is a legal description of a parcel of land within Section 1 and Section 2, Township 14 North, Range 5 East of the Gila and Salt River Base and Meridian, Yavapai County Arizona more particularly described as follows:

BEING that area as shown on the ALTA/ACSM LAND TITLE SURVEY by Shephard-Wesnitzer Engineering, Inc., performed by Earl G. Watts RLS 27253 ON June 15, 2005, and recorded in Book 125 of Land Surveys, pages 77-105 in the office of the Yavapai County Recorders;

EXCEPTING those Parcels described as Parcels A, C, D, E, F, H, I, J, K and L, as shown on the final plat of the Villas at Beaver Creek recorded in Book 58 of Maps and Plats, pages 86 through 91, inclusive, in the office of the Yavapai County Recorder, sealed by Earl G. Watts, R.L.S. 27253 on December 8, 2006.

ALSO EXCEPTING Tract R, THE VILLAS AT BEAVER CREEK, according to the plat of record in Book 58 of Maps and Plats, page(s) 86 through 91, inclusive, records of Yavapai County, Arizona;

Said Tract was formerly known as Lot 39, MONTEZUMA PARK, UNIT SIX, according to the plat of record in Book 9 of Maps and Plats, page(s) 6, 7 & 8, records of Yavapai County, Arizona.

ALSO EXCEPTING Parcels B and G, THE VILLAS AT BEAVER CREEK, according to the plat of record in Book 58 of Maps and Plats, page(s) 86 through 91, inclusive, records of Yavapai County, Arizona.

FURTHER EXCEPTING the following described parcel:

4Special Warranty Deed - Escrow No. 08031334

A parcel situated in the Northwest Quarter of Section 1, Township 14 North, Range 5 East, Gila and Salt River Base and Meridian, Yavapai County, Arizona, more particularly described as follows:

BEGINNING at the East most corner of Lot 95, El Estribo Unit 2, Book 7 of Maps, Page 78, Yavapai County Recorder, (YCR), a found ¾ inch open pipe;

Thence North 40°44'31" East, 110.00 feet along the Northwest line of Lot 95 to the North most corner of Lot 95, a found ¾ inch open pipe and the POINT OF BEGINNING;

Thence North 40°44'31" East, 1.84 feet;

Thence South 48°04'37" East, 12.52 feet;

Thence South 78°38'53" East, 3.47 feet;

Thence North 41°15'59" East, 14.49 feet;

Thence South 86°04'56" East, 68.45 feet;

Thence South 26°59'54" East, 15.24 feet;

Thence South 07°27'31" West, 66.06 feet;

Thence South 66°45'25" West, 24.84 feet to a found ½ inch rebar with cap LS 5357 and the beginning of a non-tangent curve, concave to the Southwest, having a radius of 257.21 feet, a chord bearing North 36°40'50" West, 112.62 feet;

Thence along the Northeast line of Lot 95, a curve to the left, and arc length of 113.54 feet to the POINT OF BEGINNING.

ALSO EXCEPTING the following:

A parcel located in Section 2, Township 14 North, Range 5 East, beginning at the Northeast corner of Lot 166, EL ESTRIBO UNIT FOUR, according to the plat of record in Book 8 of Maps, Page 31, records of Yavapai County, Arizona;

Thence South 69 degrees, 22 minutes, 10 seconds, East, 10.00 feet;

Thence South 37 degrees, 07 minutes, 28 seconds, West, 208.06 feet;

Thence North 61 degrees, 24 minutes, 30 seconds, West, 10.00 feet to the Southeast corner of said Lot 166;

Thence North 37 degrees, 12 minutes, 20 seconds, East, along the Easterly line of said Lot 166, 206.70 feet to the TRUE POINT OF BEGINNING.